[Crim. No. 9428. In Bank. June 3, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. DORMAN FRED TALBOT, JR., Defendant and Appellant.

Patrick J. Sampson, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment, after trial before a jury, on verdicts finding defendant guilty of murder in the first degree and imposing the death penalty.

*Facts*: On March 13, 1965, about 6:30 a.m., the mutilated body of Michael Dean Bartholomew was discovered in a rocky beach area below State Highway 1, several miles south of Oxnard, by Sergeant Maurice Mellencamp.

About 9 a.m. Sergeant Wyneken went to defendant's residence, 5305 Beachcomber, Oxnard Shores, Oxnard. Parked across the street from 5311 Beachcomber were two automobiles, a green 1950 Chevrolet convertible and a white 1960 Rambler. Two areas of the Chevrolet appeared to have blood on them.

Gerald K. Ridge, M.D., who performed an autopsy on the deceased, testified that on the head he found wounds which had resulted primarily from the application of a considerable amount of blunt force; that the left ear was apparently cut off; that there were three stab wounds in the neck; that in his opinion the redness on the undershirt was the result of soaking up a very large amount of blood from the neck wounds; that one of the neck wounds damaged the vascular system; that a hemorrhage resulted therefrom and from the joining with this wound of another wound; that the hemorrhage was the major cause of death; that the skull was also fractured; and that there were five stab wounds, from 6 to 8 inches deep, on the left chest, penetrating between the ribs into the left lung and in one instance nicking the aorta.

On the Monday afternoon before Bartholomew's death, defendant, Patricia Lucas, and Barbara Randall were in Denny's Restaurant. Defendant spoke of "rolling" Bartholomew, and said he planned to divide the money between himself and Albert Randall, Barbara's husband. Prior to this occasion there had been talk of Bartholomew's forthcoming release from the service and defendant's having learned that Bartholomew would be receiving some money.

The next day there was another conversation among defendant, Patricia Lucas, and Barbara Randall at Denny's Restaurant. Defendant said he was going to obtain another car, dress up in a suit, and follow Bartholomew until the best possible time to "roll" him. Defendant said that if he was recognized, he would have to gouge out Bartholomew's eyes. Patricia asked if that was not rather cruel, and defendant replied that it was, but that he would have to do it to keep Bartholomew from recognizing him.

That evening while they were again at Denny's, and in the presence of Hap Gately, defendant said that he was going to "roll" Bartholomew and that the money would be divided between Albert Randall and himself. Gately became somewhat

angry and asked if he was not involved in it. Defendant replied that he himself was going to do it, that Gately was not involved, and that the money would be divided between himself and Randall.

About 1:30 or 2 p.m. Thursday, March 11, 1965, the day Bartholomew was to be mustered out of the service, defendant drove to the Randalls' house in a white Rambler. At that time defendant told Randall that he (defendant) was going to "roll" Bartholomew, saying that he did not know how Randall would like the idea but he was going to do it.

Bartholomew came by around 2 p.m. Shortly afterward, defendant drove Bartholomew and the Randalls to a grocery store and then went to pick up Patricia Lucas. He later returned for Bartholomew and the Randalls, and they all went to the Randalls' house.

After dinner, Bartholomew said he was going uptown, but did not want to take his money with him. He asked Randall to keep the money for him and handed Randall more than $200 in $20 bills before he left.

The others went to Denny's Restaurant. As they left, Barbara put a knife into her pocketbook. Defendant drove them in his Rambler and said that he was going to catch Bartholomew in a crosswalk and run him down with the car.

Barbara warned defendant that he would be recognized and arrested. He said that he knew another man, named Frank, who had a car; that he would take this car and use it in hitting Bartholomew; that he would hit Frank over the head and pour beer over his clothing and into his mouth; and that the latter would be blamed instead of defendant. A subsequent search for Frank, however, proved unsuccessful.

Defendant, Patricia, and the Randalls then proceeded to Denny's Restaurant, where they sat in a booth. Randall went to a corner of the restaurant to talk with Hap Gately and Dale Scheinert. After several minutes they all came to the booth. There Barbara heard defendant ask, "How much?" Gately said, "$25 or $30." Gately asked defendant when the incident would take place, and defendant indicated that night.

A little later Bartholomew stopped by, obtained $20 from Randall, and then left. The others departed, taking Patricia Lucas to the trailer court in which she lived at Camarillo. En route, Patricia asked defendant if they could possibly be married if he obtained the money. He said that if he could obtain the money, they would be married. She asked how long

they would have to wait, and he said they would possibly be married the first of the week.

Defendant and the Randalls drove back to Denny's. On the way, Randall put Barbara's knife into the glove compartment of the car. Defendant said that he was going to have to obtain some money, adding that he and Patricia were going to be married because he thought she was pregnant and he wanted to save her reputation. He spoke again about "rolling" Bartholomew.

Later Bartholomew joined them in the restaurant. They stayed until around 3 a.m. and then left in defendant's Rambler, Bartholomew sitting in the back seat. As they drove toward the Randall house, defendant gave Randall the key to the glove compartment and motioned for him to open it. Randall removed the knife and handed it to defendant, who opened the blade and placed the knife on the seat by his right leg. When they got out of the car and went into the house, defendant stuck the knife into the belt of his trousers.

Bartholomew was planning to stay at the Randalls' that night, and with bed linens supplied by Barbara he prepared a makeshift bed on some chairs in the kitchen, as he usually did when he stayed with them.

Defendant and the Randalls then left in defendant's Rambler to go to the Navy base to pick up Randall's Navy "greens" for mustering the next morning. In the car, Randall said that the bedroom gas heater had been turned on. Later, while at a cafe across from the Navy base, Randall again mentioned that the heater had been turned on. Barbara asked if he had lighted the heater, and he said he had not. Defendant said he wondered if Cowboy (Bartholomew's nickname) had had enough. Randall replied he did not know.

They then drove back to the Randall house and entered the kitchen, observing first that the kitchen light was on. Randall went over to the chairs on which Bartholomew was sleeping and told him to get up. Bartholomew raised his head, moaned something, and lay back down.

Defendant used some foul language and then stormed out of the house. He came back in a few minutes with a wrench-type object made of steel. He tried to hand the wrench to Randall, but Randall did not take it, saying that he could not go through with it. Defendant said that if Randall would not do it, he himself would do what had to be done.

Defendant then told Randall and Barbara to stay in the

bathroom a moment. They heard what sounded like the thudding of something being struck six or seven times by an object. About a minute later Randall opened the bathroom door and pushed Barbara toward the front door. Defendant was standing in the kitchen doorway.

Barbara and Randall went outside the house, and shortly afterward defendant came out with the wrench in his hand. He started to say something about Bartholomew, but then stopped and went back into the house.

Two or three minutes later defendant came out again. Looking at Randall, he said that Bartholomew was dead. Randall said that he could not dispose of the body and could not keep his end of the bargain. Defendant remarked that it looked as if he would have to do the whole job himself.

Back in the house, defendant asked Barbara to check his shirt and pants to see if there was any blood on them. When she told him that he had some blood on his shirt, he said that he hated to get rid of the shirt because it belonged to his brother and that he would have it cleaned. He then went in to take a shower.

About a quarter after six that morning, two friends of Bartholomew came by with some things Bartholomew had left in their car. Defendant told Randall not to let them come into the house, and Randall went outside to talk with them. He told them that Bartholomew had become angry the night before and had bought a car and left.

After taking a shower, defendant put back on the clothes he had been wearing, except for the white shirt. He then rolled up the towel he had used after showering and put it in the back seat of the Rambler, together with a wash cloth and the socks he had been wearing. He said they would have to be disposed of.

As defendant and the Randalls were driving from the Randalls' house, defendant remarked that he believed Randall did not think he would go through with what he had done. He stated again that he needed the money, so that he could save Patricia's reputation, as he thought she was pregnant. There was also a conversation about what should be done with Bartholomew's body, but nothing was decided definitely.

They then picked up Patricia, who asked defendant what was wrong. He told her he had killed Bartholomew earlier that morning at the Randall place. Patricia asked if Barbara had been there when it happened and if she had seen Bartholomew. She also asked if Bartholomew had suffered or if his death had

been quick. Barbara said that she had been there but had not seen Bartholomew and that she did not know if he had suffered. Previously defendant had told Barbara to say Bartholomew did not know what had hit him.

Defendant told Patricia that Bartholomew had been beaten with a wrench and had been stabbed in the heart. When she asked defendant how he knew Bartholomew was dead, defendant replied that when the knife wound was inflicted, he heard the heart burst.

Thereafter, defendant told Ed Ratliffe that Bartholomew had been murdered and that he wanted a panel truck to remove his body. As they were talking, a man defendant knew drove up with a panel truck. Defendant asked if he could use the truck and was told that he could about 6 p.m. that evening.

Defendant, Ratliffe, Patricia, and Barbara then went to Denny's, where they had a discussion about moving and disposing of Bartholomew's body. Defendant said that he would move the body in the panel truck later that night when it was dark and dispose of it in the mountains above Ojai.

About 11 p.m., when Barbara asked defendant and her husband if Bartholomew's body had been removed from the house, they told her that they had not taken it above Ojai, as planned, but had taken it to Point Mugu; that the body was thrown into the beach area; and that the knife had been thrown into the ocean.

*Questions*: First. *Was the evidence sufficient to warrant instructions on murder committed in the perpetration of a burglary?*

*Yes.*

 (i) The trial court instructed the jury, in conformity with statutory provisions, that murder committed in the perpetration, or attempted perpetration, of burglary is murder in the first degree and that a person who enters any house with the intent to steal the personal property of another or with the intent to commit an assault with a deadly weapon is guilty of burglary. The court also instructed on the definition of a deadly weapon and on the necessity for an entry with a specific intent. (Pen. Code, §§ 189, 459, 245.)

Defendant contends that his entry into the Randall house just prior to the killing and any intended felony on his part were consented to by the Randalls. As a result, he says, he did not commit the crime of burglary, and the giving of an

instruction on murder committed in the perpetration of a burglary therefore constituted prejudicial error.

Section 459 of the Penal Code provides, in part: "Every person who enters any house, room . . . or other building . . . with intent to commit grand or petit larceny or any felony is guilty of burglary."

■ No breaking or use of force is required under our statute, and it is settled that the entry need not constitute a trespass and that "One who enters a room or building with the intent to commit a felony is guilty of burglary even though permission to enter has been extended to him personally or as a member of the public." (*People* v. *Sears,* 62 Cal.2d 737, 746 [14, 15] [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Deptula,* 58 Cal.2d 225, 228 [2] [23 Cal.Rptr. 366, 373 P.2d 430].)

The underlying theory of the cases holding that consent to the entry is not a defense to a charge of burglary in this state is that since burglary is defined as an entry with the specified evil intent, it is an integral offense, indivisible into ingredients, and that consent cannot be made to relate to entry alone as a constituent ingredient. (See 93 A.L.R.2d (1964) p. 548, fn. 14.)

■ Defendant apparently argues that if the one in possession of the property gives consent to the entry with knowledge that the person entering intends to commit a felony therein, the consent relates to all the ingredients and therefore constitutes a defense. No California case has been found in which the person in possession has given permission to enter under such circumstances.

We need not here determine whether there is any merit to defendant's contention, because, in any event, there is evidence in the record that Randall withdrew his consent to the commission of the planned felony and that defendant thereafter entered the house with the proscribed intent.

Barbara Randall testified that after Bartholomew lay down on the chairs to go to sleep, and she, her husband, and defendant left the house, her husband said that the gas heater in the bedroom had been turned on but not lighted; that when they returned to the house three hours later, her husband commented that the fact that the kitchen light was on indicated that something must have gone wrong; that when they entered, her husband went over to the chairs on which Bartholomew was sleeping, shook him, and told him he would have to get up; that defendant flew into a rage, went outside, and

re-entered the house, carrying a "wrench-type object made of steel"; that he sought to hand the wrench to her husband, but her husband refused to take it, saying that he could not go through with the plan and would not do it; that defendant said he himself "would do what had to be done"; that her husband stepped into the bathroom, where she had been standing in the doorway, and closed the bathroom door; that they heard a thudding noise as though something was being struck six or seven times; that she and her husband went out of the house, followed by defendant; that defendant started to say something about Bartholomew, but then turned and went back into the house; that two or three minutes later he came back into the yard, announcing that Bartholomew was dead; that there was a discussion about disposing of Bartholomew's body, and her husband said he could not dispose of it and could not keep his end of the bargain; that they went back into the house, and defendant took a shower; that they thereafter left the house in defendant's car; and that in the car defendant "made the statement that he thought that my husband didn't think that he would go through with what he had done."

On cross-examination Barbara Randall testified that prior to the time her husband stepped into the bathroom and closed the door she had believed the matter of "rolling" Bartholomew to be a joke.

William Gately, who assisted defendant and Randall in disposing of the body, testified: "He [defendant] stated that he had gassed, gassed Mr. Bartholomew so he would be unconscious, and that he picked up a monkey wrench type object and started beating him on the head with it, and presuming he was dead, he left the house to go outside for a cigarette. And when he came back in the house, Mr. Bartholomew was trying to get off the chairs, so he picked up the object again and continued beating him on the head. And he said it got so sickening that he had to cover up his face, Mr. Bartholomew's face with a napkin. And then he continued beating on him. Then he slit his throat and stabbed him in the chest."

From the above evidence, the jury could have inferred that Randall's consent to the commission of the assault upon Bartholomew was conditioned on Bartholomew's being first rendered unconscious; that before defendant and the Randalls entered the house just prior to the attack, Randall surmised, because the kitchen light was on, that Bartholomew had not been rendered unconscious; that when Randall commented

before entering the house that the fact that the kitchen light
was on "was kind of suspicious to him," because ordinarily it
would have been turned out if nothing was wrong, defendant
should have understood that Randall may have intended to
qualify any consent previously given by him to the planned
attack; that since arousing Bartholomew would make an
attack upon him less likely to succeed, Randall's shaking him
after they entered the house and telling him he would have to
get up indicated that under the circumstances Randall was not
willing to proceed with the plan; that defendant's display of
anger showed that he had concluded that Randall would not
join in the planned attack and that if it was to be carried out,
he would have to do it alone; that when defendant went
outside for a wrench and re-entered the house, he intended to
commit the assault by himself, if necessary; that he tried to
hand the wrench to Randall to see if his conclusion that
Randall would not join him in the commission of the attack
was correct; that when Randall refused to take it, defendant
proceeded with the attack; and that after defendant had
injured Bartholomew to such an extent that he thought Bar-
tholomew was dead, he went outside for a cigarette, and then
returned to see if he had actually succeeded in killing
Bartholomew and, if not, to finish the job.

Accordingly, although defendant's entry may have been
consented to in each instance by the Randalls, the persons in
possession of the house, it is clear that on at least one occasion,
and possibly more, defendant entered the house with the
intent to commit a felony therein but without the Randalls'
consent to his proposed commission of the felony.

Under the circumstances, there was evidence to support a
finding that defendant was guilty of the crime of burglary,
and it was therefore proper for the trial court to instruct the
jury on murder committed in the perpetration of a burglary.

■ (ii) Defendant contends that the application of
section 459 of the Penal Code to the present case violates the
Fourteenth Amendment to the United States Constitution. He
says that if, in furtherance of the conspiracy with the Ran-
dalls, he had entered the Randalls' backyard with the intent
to assault Bartholomew and killed Bartholomew while the
latter was sleeping in a hammock, the crime of burglary would
not lie, and that if the burglary in the present case is upheld,
the only distinction between the hypothetical example and the
actual case is the circumstance that Bartholomew died within
a dwelling.

Persons within buildings are in greater danger of suffering at the hands of felons bent on stealing from them or engaging in felonious conduct than persons outdoors would be. Consequently, the classification contained in section 459 of the Penal Code is proper.

As stated in *People* v. *Stratton,* 136 Cal.App. 210, 212 [28 P.2d 699] : "The act of the legislature in framing section 459 of the Penal Code was for the purpose of protecting buildings, residences especially, and in so doing, it necessarily singled out those offenses for which anyone actuated by a criminal intent would enter a building for the purpose of committing. In entering a building with intent to commit petty or grand larceny or a felony therein, the one so entering, places in peril anyone who might be within the building so entered. The probability of one entering a building for the commission of any offense which does not come within the definition of grand or petty larceny or a felony is so remote that the language of section 459 . . . cannot, by any reasonable construction, be construed as an unreasonable classification."

(iii) Defendant contends that the felony-murder rule is not applicable, because the felony intended upon his entry was an integral ingredient of the murder.

A similar contention was rejected by this court in *People* v. *Hamilton,* 55 Cal.2d 881, 901 [13] [362 P.2d 473], where we said : "Defendant contends that the instruction on the 'felony-murder' doctrine was error because the felony element of the burglary was an integral ingredient of the homicide itself. It is urged that to thus utilize an ingredient of the homicide to find the elements of a burglary so that the homicide can be automatically converted by application of the 'felony-murder' doctrine into murder of the first degree, is a 'bootstrapping' arrangement which the defendant contends was never intended by the Legislature. In support of his contention defendant urges that where, as here, the felony itself (burglary) results from the existence of the very intent necessary to establish the homicide, that the element of causation necessary for application of the doctrine is not present. It is the theory of the defendant that the 'felony-murder' rule should only be applied when the felony involved is an independent felony and not an integral part of a homicide plan. While it is true that this independent felony test has apparently been adopted in New York . . . it is not the rule that has been applied in California. . . . There is no sound reason why California should change its rule at this late date."

704

■ Defendant argues that he entered with the intent to assault Bartholomew, but killed him. If he did not intend to kill Bartholomew, the killing was either negligent or accidental; but, as pointed out by this court in *People* v. *Washington*, 62 Cal.2d 777, 781 [5] [44 Cal.Rptr. 442, 402 P.2d 130], the purpose of the felony-murder rule is to deter persons from killing negligently or accidentally by holding them strictly responsible for *all* killings they commit during the perpetration, or attempted perpetration, of any of the enumerated felonies.

■ Although we held in the *Washington* case that this purpose is not served by punishing felons for killings committed by their victims, it is clearly served by punishing them for any killings which they themselves commit, whether the killings were committed intentionally, negligently, or accidentally.

It should be noted, also, that there was evidence that defendant entered with the intent to commit the crime of grand larceny.

Under the circumstances, there was clearly a basis for the giving of an instruction on the felony-murder rule.

■ (iv) Defendant contends that the felony-murder rule should not apply here, because the crime of burglary referred to in section 189 of the Penal Code is the crime of burglary as defined by the Penal Code in 1872.

He says that in pertinent part section 189 of the Penal Code reads the same as when it was enacted in 1872, but that as originally enacted that same year section 459 was substantially different from the present section 459. Even as burglary was defined by the Penal Code in 1872, however, it would appear that defendant was guilty of the crime.

As originally enacted, section 459 of the Penal Code required that the burglary occur in the nighttime and that the perpetrator forcibly break and enter, or enter without force through any open door, etc., with the requisite intent. (West's Annotated Cal. Penal Code, § 459, historical note.)

In the present case, these elements were satisfied. Barbara Randall's testimony reflects that upon their returning to the premises just before the killing, very early in the morning before daylight, Randall unlocked the door to the house and opened the kitchen door; that the Randalls and defendant entered the house; that defendant then went outside and returned with a wrench; and that it was still dark after the killing.

If, upon entering with the wrench or later re-entering, defendant walked through open doors, he would have come within that portion of the original statute which read, ". . . or without force enters through any open door." On the other hand, if he opened unlocked doors, it appears that he would still have come within the original statute. The statute referred alternatively to one who "forcibly breaks." In 13 American Jurisprudence, Second Edition, (1964) Burglary, section 8, page 325, it is observed that any act of physical force, although slight, whereby an obstruction to entering is removed, is regarded as sufficient to constitute a breaking, and that the rule has been applied to the opening of a closed but unlocked door.

In any event, both section 189 and section 459 of the Penal Code have been amended more than once since their enactment.

In 1876, only four years after its enactment, section 459 was amended to read: "Every person who enters any house, room . . . or other building . . . with intent to commit grand or petit larceny, or any felony, is guilty of burglary." (Code Am. 1875-76, ch. 56, § 1, p. 111.) Thereafter, in *People* v. *Miller,* 121 Cal. 343, 347 [53 P. 816], this court held that the crime of burglary referred to in section 189 of the Penal Code was committed whenever a person entered a house with intent to commit grand or petit larceny or any felony.

It is a generally accepted principle that in adopting legislation the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have enacted and amended statutes in the light of such decisions as have a direct bearing upon them. (*Cole* v. *Rush,* 45 Cal.2d 345, 355 [8] [289 P.2d 450, 54 A.L.R.2d 1137]; *Buckley* v. *Chadwick,* 45 Cal.2d 183, 200 [14] [288 P.2d 12, 289 P.2d 242]; *People* v. *Nash,* 52 Cal.2d 36, 47 [338 P.2d 416].)

Accordingly, the crime of burglary referred to in section 189 of the Penal Code is the same as presently set forth in section 459. Therefore, the trial court properly instructed on murder committed in the perpetration of burglary. (*People* v. *Sears, supra,* 62 Cal.2d 737, 745.)

■ Second. *Did the trial court properly receive in evidence a color photograph of the deceased?*

*Yes.* Defendant contends that the trial court erred in admitting into evidence, over objection, a color photograph of the

deceased, in that it was inflammatory and of insufficient probative value.

He says that the only relevancy of the photograph offered by the People was that it aided the pathologist in testifying to the cause of death. He does not dispute its relevancy in this respect, but he contends that the probative value was slight. He states that the photograph did not corroborate eyewitness testimony nor tend to show or explain such matters as the position of the murder weapon, and he states that cumulative proof of the existence of a criminal agency as the cause of death is unnecessary in a case such as this.

It was within the discretion of the trial court to determine whether the probative value of the photograph outweighed its probable prejudicial effect. (*People* v. *Mathis,* 63 Cal.2d 416, 423 [1] [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Kendrick,* 56 Cal.2d 71, 91 [22] [14 Cal.Rptr. 13, 363 P.2d 13].)

The trial judge acted well within his discretion in concluding that the photograph had sufficient probative value to warrant its reception into evidence. He was mindful that the probative value should outweigh any possible prejudice, and it is presumed the trial court applied this test in its determination. (Code Civ. Proc., § 1963, subd. 15.)

Defendant contends that the trial judge did not limit the introduction of the photograph to illustrating the pathologist's testimony nor admonish the jurors against the picture's prejudicing them against defendant.

No limiting instruction was requested when the exhibit was received into evidence or when it was shown to the jury. In the absence of such a request, defendant is not in a position to urge error on appeal. (*People* v. *White,* 50 Cal.2d 428, 430 [1] [325 P.2d 985].)

Moreover, the court in its formal instructions admonished the jurors to determine the issues of fact uninfluenced by passion or prejudice against defendant. It is presumed the jurors followed the admonitions of the court. (*People* v. *Sutic,* 41 Cal.2d 483, 494 [9] [261 P.2d 241].)

Third. *Did the trial court err in admitting into evidence on the penalty trial of the case the color photograph referred to above and a black and white photograph?*

*No.* Defendant contends that the exhibits referred to were inflammatory and had no proper place in the penalty phase of the trial, and complains of the district attorney's argument to the jury calling attention to what these photographs depicted as justification for imposing the death penalty.

Defendant admits that no objection was interposed at the penalty phase to these exhibits. No objection was interposed to the black and white exhibit when it was received into evidence at the guilt phase and given to the jury. No additional evidence was introduced at the penalty phase, but the court admonished the jurors to consider all the evidence received throughout the trial.

Defendant contends that the failure of his trial counsel to object to the photographs at the penalty phase deprived him of the assistance to which he was entitled, relying on *People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]. This contention is without merit, since defendant was not deprived, as was found in the *Ibarra* case, of any crucial defense.

Defendant relies on *People* v. *Love,* 53 Cal.2d 843 [3 Cal. Rptr. 665, 350 P.2d 705], and *People* v. *Hines,* 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398], in support of his contention of prejudice. Each of those cases, however, is distinguishable from the present situation.

In *People* v. *Love,* over the defendant's objection the trial court admitted into evidence on the penalty issue a photograph showing a front view of the deceased lying on a hospital table. It did not show the wound; it showed the expression of her face in death. This court said, at pages 856-857 [16]: ". . . Apart from matters admitted by defendant and established at the trial of guilt, the photograph . . . tended to prove only that Mrs. Love died in unusual pain. Proof of such pain is of questionable importance to the selection of penalty unless it was intentionally inflicted. Moreover, even if relevant and material, Mrs. Love's pain was more than adequately described by the doctor. There was no need to show the jurors the expression of her face in death . . . the photograph . . . served primarily to inflame the passions of the jurors and . . . should have been excluded." The prejudicial effect was aggravated by the district attorney's argument to the jury referring several times to pain suffered by the deceased.

In *People* v. *Hines, supra,* 61 Cal.2d at page 173 [8], with reference to the penalty trial, the court said: "Defendant's second claim that the introduction of the allegedly 'gruesome photographs' of the deceased worked error, since their probably prejudicial effect outweighed their probative value, cannot stand in the absence of defendant's counsel's objection to their admission." The court, however, commented that since the defendant described the circumstances of the crime

and admitted his guilt (he pleaded guilty to murder in the first degree), the court saw no probative value in the photographs which would outweigh their prejudicial effect (citing *People* v. *Love, supra,* 53 Cal.2d 843, 854-857).

In the present case, defendant did not plead guilty, and the photographs were not illustrative merely of pain. They were used in connection with the autopsy surgeon's testimony and helped clarify for the jury just what happened to the deceased.

The photographs were relevant and admissible to show the circumstances of the crime and facts in aggravation of the penalty (Pen. Code, § 190.1), and the district attorney properly referred to them in his argument. (*People* v. *Cotter,* 63 Cal.2d 386, 399 [8] [46 Cal.Rptr. 622, 405 P.2d 862].)

 Fourth. *Was the search and seizure of the items in the trunk of the Chevrolet proper?*

*Yes.* Defendant does not urge that there was impropriety in connection with the police's being at his premises and with his being taken into custody the morning of March 13, 1965, nor does he urge that any criteria were absent for searching the vehicle when it was observed by Sergeant Wyneken near defendant's premises that morning, at which time the sergeant found apparent blood stains in the right rear fender and trunk areas. (*People* v. *Burke,* 61 Cal.2d 575, 579 [2] [39 Cal.Rptr. 531, 394 P.2d 67].)

Defendant's principal contention of an unlawful search and seizure is predicated on the fact that the automobile was removed from the scene and the trunk opened and searched subsequently.

Sergeant Wyneken testified that he went to the area of defendant's residence about 9 a.m. on March 13 and observed the Chevrolet parked nearby. He examined the right rear fender and trunk areas, as noted above, and found what appeared to be blood. A criminalist also testified that he examined the Chevrolet there that date and found human blood in the bumper area and that after the car was removed, he received a presumptive test for blood in the area of the right rear tire.

This finding, in conjunction with the surrounding circumstances, warranted a reasonable search of the entire automobile, and it was proper to seal the trunk area for a later, more scientific examination as a part of the reasonable search process.

The record shows that Sergeant Wyneken observed the

trunk sealed with stickers in such a way that it could not be opened without the seals' being broken, at the scene near defendant's premises March 13; that the automobile was moved while the officer was there; that several days later the seals on the trunk, as well as both doors, were broken, and the trunk was opened; that a gas can, to which defendant particularly referred, was removed from the trunk and dusted for fingerprints; and that blood analysis of various items was also made.

Under the circumstances, the sealing of the trunk was the initial step taken in the process of the scientific investigation, and the actions of the authorities with reference to the automobile were proper.

 In any event, defendant does not establish prejudice. Defendant specifies the gas can, a metal strip, and floor matting as having come from the automobile, and specifies the photograph of the interior trunk area. These items were received into evidence without objection, as were some other items, including a sweater defendant was wearing, a hair from the floor mat, and similar items. In the absence of an objection at the trial, defendant is not in a position to complain. (*People* v. *Richardson,* 51 Cal.2d 445, 447 [2] [334 P.2d 573].)

In light of the entire record, there was no miscarriage of justice. (*People* v. *Parham,* 60 Cal.2d 378, 384 [33 Cal.Rptr. 497, 384 P.2d 1001].)

 Fifth. *Did the trial court properly limit testimony of defendant's statements relative to other indicated offenses?*

*Yes.* Defendant contends that testimony of his statements relative to other indicated offenses was immaterial and inflammatory.

The first instance concerns Patricia Lucas' testimony that defendant wrote some numbers on a place mat and then said there were 66 murders he had had something to do with. No objection was interposed at the time of this testimony, and defendant is therefore not now in a position to object. (*People* v. *Millum,* 42 Cal.2d 524, 528 [267 P.2d 1039].)

The other instance concerns Dale McCannon's testimony that defendant pointed a gun at Michael Brady and said, "Three or four people are already dead so one doesn't make any difference and I have got Cowboy made for next week." Objection was interposed on the ground of immateriality and was overruled.

At the district attorney's request, the court admonished the

jurors, relative to the first instance, that they were not to consider the matter as any evidence or proof that defendant was involved in 66 murders or any other alleged murder except the one alleged in the case at bar and that the evidence could be considered "only for the purpose of considering it as one of the many circumstances preceding and leading up to events here in question and which may reflect upon the state of mind of the defendant or any of the participants, insofar as their states of mind and their actions may have been material."

As to the second instance, the court similarly admonished the jurors, following the district attorney's request, stating that the matter should not be considered any evidence that defendant had been involved in any murders except insofar as the jurors might determine what his conduct was in relation to the charge at bar, and that the evidence was "received for the limited purpose of showing some of the many circumstances and events that led up to the acts here in question, as they may reflect upon the state of mind of the participants and the intentions involved."

It is presumed that the jurors followed the admonitions of the court. (*People* v. *Sutic, supra,* 41 Cal.2d 483, 494 [9].) In so doing, they would have limited the evidence in question to state of mind, as the court cogently admonished them.

State of mind was material, in light of defendant's defense to the effect that the killing was nonvolitional and that he acted without malice aforethought and without premeditation or deliberation.

It was indicated early in the trial that defendant's defense would be "psychiatric in nature." As the district attorney pointed out in his argument to the jury, defendant "hasn't been involved in 66 murders, but he would like to think of himself as the type of a tough who would be doing this sort of thing. This is the frame of mind he is building up for himself." As to the other statement, the district attorney, in effect, urged that it was indicative of a serious purpose on defendant's part.

The testimony of these statements could be appropriately viewed in the light urged by the district attorney. The statements in their full context were necessary for their evaluation and tended to counteract matter urged by the defense. The testimony was material and proper. (*People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769].)

 Sixth. *Did the trial court prejudicially err in not reading to the jury an instruction on manslaughter?*

*No.* It is unnecessary to pass upon the technical argument which defendant raises relative to the failure to give an instruction on manslaughter, as we are of the opinion that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the alleged error. Therefore, pursuant to the requirements of article VI, section 4½, of the California Constitution, it must be disregarded. (*People* v. *Teale,* 63 Cal.2d 178, 196-197 [20] [45 Cal.Rptr. 729, 404 P.2d 209] ; *People* v. *Watson,* 46 Cal.2d 818, 837 [13] [299 P.2d 243].)

Seventh. *Was the district attorney's argument on the penalty phase within the scope of section 190.1 of the Penal Code?*

*Yes.* Defendant contends that in several instances the district attorney's argument to the jury on the penalty phase was prejudicial. In the instances to which defendant refers, no objection was interposed at the time of the statements.

"Misconduct in argument may not be assigned on appeal if it was not assigned at the trial, unless the misconduct contributed to the verdict or was so unredeemable that nothing whatever would have cured it." (*People* v. *Mitchell,* 63 Cal.2d 805, 809 [2] [48 Cal.Rptr. 371, 409 P.2d 211].)

The matters complained of were not such as may be urged in the absence of objection.

Defendant first specifies the district attorney's comment to the effect that the brutality of his acts warranted the death sentence. Defendant urges that little weight should be given to retribution in determining the admissibility of evidence in a penalty trial. The argument complained of, however, falls within the purview of section 190.1 relative to the circumstances surrounding the crime and matters in aggravation of the penalty.

Defendant notes a comment about a deliberate attempt to asphyxiate the victim by turning on the gas. Defendant indicates that the gas was turned on by Randall on his own initiative. However, William Gately testified to a statement in which defendant said he had gassed Bartholomew so that Bartholomew would be unconscious. The comment was not beyond the scope of the record.

Defendant observes that there was no evidence tending to show an intent to inflict pain and torture Bartholomew. The emphasis in the particular comment was on the brutal nature of the offense and was within the proper scope of argument for the reasons noted above.

■ Defendant also specifies the district attorney's comments suggesting that defendant could not be rehabilitated and that, if given another opportunity, would very likely commit the same type of crime. Defendant complains that this argument would invoke punishment on him for an incurable mental disease, which caused Bartholomew's death. However, the People presented medical testimony, in rebuttal, to the effect that defendant had the requisite mental capacity to commit murder. Argument to the effect that a defendant is not the type of person who could be rehabilitated and is recidivist in nature appears within the purview of section 190.1 of the Penal Code referring to a defendant's background.

Defendant contends that it should not be assumed he would be released prematurely if given a life sentence. The argument in question was not in those terms. The jurors were instructed to assume that the proper officials would not parole defendant unless he could be safely released into society. It is presumed that the court's instructions were followed.

■ Finally, defendant specifies a comment to the effect that the way to prove remorse on his part was to put on evidence of remorse, that there must have been some people who had seen defendant and observed his actions since the crime, but that none had come to the stand and said defendant had repented.

Defendant complains that the remarks constituted a comment on his failure to testify, in that the witnesses whom he was supposed to call would testify to what he told them. The remarks were, however, in terms of how defendant appeared and acted and were remote from an intimation that defendant himself should have testified.

He contends that the comment was improper in inferring that there must be a finding of mitigating circumstances for life imprisonment. The comment was not of such import, and the jurors were instructed that it was not essential to their decision that they find mitigating circumstances. The question of remorse or the lack of it was a proper circumstance for the jury to consider. (*People* v. *Mitchell, supra,* 63 Cal.2d 805, 817 [9].)

From the foregoing, it appears that there was no prejudicial error. (See Cal.Const., art. VI, § 4½.)

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.

Appellant's petition for a rehearing was denied June 29, 1966. Peters, J., and Peek, J., were of the opinion that the petition should be granted.