Filed 2/28/14  P. v. Tackwell CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TODD BRANDON TACKWELL,<br><br>        Defendant and Appellant. | A136397<br><br>(Alameda County<br>Super. Ct. No. H50124) |

A jury convicted Todd Brandon Tackwell of the continuous sexual abuse of a 13-year-old minor he met over the Internet, and found true the allegation that he committed the offense during the commission of a first degree burglary consisting of repeatedly sneaking into the minor's bedroom in her father's house, with her cooperation, for the purpose of having sexual relations with her.  The trial court sentenced defendant to a mandatory term of 25 years to life under Penal Code[1] section 667.61.

Defendant challenges the burglary finding, contending the trial court erred in refusing to instruct the jury that the prosecutor had the burden of proving the defendant did not have consent to enter the home.  We affirm.

## I.  BACKGROUND

Defendant was charged by second amended information with one count of continuous sexual abuse (§ 288.5, subd. (a)), one count of sending harmful matter (§ 288.2, subd. (a)), one count of sodomy of a child under 14 by a defendant more than

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

10 years older (§ 286, subd. (c)(1)), one count of lewd act upon a child (§ 288, subd. (a)), and 11 counts of lewd acts upon a child (§ 288, subd. (c)(1)). The continuous sexual abuse count and the lewd act count under section 288, subdivision (a) each contained a special allegation that defendant committed the offense in the course of a first degree burglary in violation of section 667.61, subdivision (d)(4). The 11 counts charging lewd acts under section 288, subdivision (c)(1) were dismissed on the prosecutor's motion. The court dismissed the count concerning the sending of harmful matter on the prosecution's motion at trial, leaving the continuous sexual abuse count, the sodomy count, and one lewd act count under section 288, subdivision (a). The sodomy and lewd act counts were alleged in the alternative to the continuous sexual abuse count.

On April 24, 2012, a jury found defendant guilty of continuous sexual abuse and found the burglary special allegation true. On July 20, 2012, the trial court sentenced defendant to 25 years to life in prison under section 667.61, subdivision (a). Defendant timely appealed.

**A.** *Facts*

S. Doe, a 13-year-old girl, met defendant in an Internet chat room in October 2009. She told defendant her age from the very beginning. After chatting with defendant about 10 times in the public chat room, S. set up a private chat room with defendant. They chatted a couple of hours each day. Through these chats she eventually learned defendant was 34 years old. S. began calling defendant every day and sent picture texts. S. sent defendant photos of her face and her cat. Defendant sent photos of himself, including one photo of his penis and a toilet. S. deleted the penis photo. It made her uncomfortable because she had never seen a penis before.

By December, S. developed romantic feelings for defendant. She communicated this to defendant, and defendant told her he felt the same way. Thinking that she was "going out" with defendant, S. talked with defendant about whether he would be able to come to California. They discussed this possibility several times between December and January. S. thought defendant would be able to find a job and place to live in California. Sometime in January 2010, defendant told S. he would move out to California. He did

not mention whether he had lined up a job or a place to stay. She was excited about actually meeting him.

Defendant arrived in California after S. had gone back to school following her Christmas vacation. Defendant and S. arranged to meet at a supermarket near S.'s middle school. She ran up and hugged him when she first saw him. They walked to a park, where defendant gave S. her first kiss. In S.'s mind, this "confirmed" they were going out. Defendant drove S. to her house so that S. could give him a teddy bear as a present. It became routine for S. and defendant to rendezvous at the supermarket about three or four times a week when S. stayed with her mother in San Jose. They talked on the phone on weekends when S. stayed at her father's house in Pleasanton.

Defendant would visit S. at her mother's house when no one was home. During one such visit, about a week after defendant arrived in California, S. said she wanted to take a shower. Defendant offered, "You want me to join?" S. said okay. While they were naked in the shower, defendant anally penetrated S. without saying anything in advance. S. found this painful and told defendant she did not want to do that anymore. He said okay.

In February, after S. spoke of changing her living arrangements to stay with her father on the weekdays, defendant took a job in Pleasanton making pizza. Because S. was still staying with her mother on weekdays between February and June, S. only saw defendant on weekends when she was at her father's house in Pleasanton. On Saturdays, S. would go horseback riding while her father waited for her and, upon returning home, she would bike over to see defendant at the pizza place. S. felt bad that defendant was still living in his truck and asked defendant if he would like to sleep in her bedroom. Defendant agreed.

S.'s bedroom was located on the ground floor of a two-level home. S.'s father's bedroom was located on the upper floor, and he would have to descend the stairs to reach S.'s room. S. could hear her father using the stairs. Although her father could hear the downstairs doors from his room, he could not hear the windows open and close. Defendant would sneak in through a window between 8:30 p.m. and 10:00 p.m. and leave

3

the same way in the morning to avoid being seen by S.'s father. S. would check for her father before defendant could use the downstairs bathroom. Whenever S.'s father would come downstairs—an occurrence that happened about 10 to 20 times—defendant would hide in the closet. S. did not want her father to see defendant in the house because she thought her father might "get the ax and kill him."

The first night defendant slept over, he kissed and hugged S. In the months that followed, defendant initiated gradually escalating sexual activity with S. He first touched S.'s vaginal area over her underwear and did so multiple times over the course of his time with S. In March, defendant had anal sex with S. for the second time, after asking her whether she would like to try it again. After the act, S. told defendant that she never wanted to do that again. In April, defendant suggested digitally penetrating S. and licking her vaginal area, and she said okay. About 50 to 75 percent of the time he came over, he would digitally penetrate S., and he licked S.'s vaginal area on about 10 separate occasions. Also around April, defendant had vaginal intercourse with S. for the first time. One afternoon he took S. to a motel where they had vaginal intercourse.

After S. graduated from the eighth grade in June, she began to live with her father during the week and with her mother on weekends. Defendant's overnight visits became more frequent, and he continued to digitally penetrate, orally copulate, and vaginally penetrate S. Defendant also had S. orally copulate him.

On July 23, 2010, defendant was driving in his pickup with S. riding as a passenger. Pleasanton Police Officer Matthew Kroutil noticed that defendant's windshield was defective and pulled him over. The officer asked for defendant's license, registration, and proof of insurance, and noted his age. Upon seeing S. in the truck, he also asked defendant how old his daughter was. Defendant replied that he and S. were just friends. When Officer Kroutil asked where defendant was staying, defendant replied that he was homeless and looking for a job. Turning to S., Officer Kroutil then asked her how old she was. S. replied that she was 13 and that she and defendant were "just hanging out" as friends. Officer Kroutil asked S. for her father's name and contact information. S. claimed to be unsure of her home address, and the phone number that she

4

provided was out of service. After further inquiries and a search of defendant's person yielding two opened condoms and a letter from S., Kroutil placed defendant under arrest for suspicion of violating section 288.

Emily Doe, a resident of Lincoln, Nebraska, testified under Evidence Code section 1108. She read about defendant's arrest in a local newspaper and called the Lincoln police to report she had had a similar experience with defendant when she was 14 years old and he was in his late 20's. Defendant moved into a room in the basement of Emily's mother's house around September or October, just after Emily's 14th birthday. Defendant talked to Emily every day, making her feel as though he was her "refuge" from a difficult family situation. Defendant kissed Emily the following February. Around April, defendant requested that she perform oral sex and anal sex. Emily complied. Around May, defendant began to have vaginal intercourse with Emily. This continued for about two years, until Emily broke off their relationship. She did not report it to police at that time because she still loved defendant and did not want him to go to prison.

## II. DISCUSSION

The jury found true the allegation pursuant to section 667.61, subdivision (d)(4) that defendant's offense of continuous sexual abuse of a child under age 14 was committed during a first degree residential burglary. That finding subjected defendant to a mandatory indeterminate sentence of 25 years to life. (§ 667.61, subd. (a).) Defendant does not challenge his conviction for continuous sexual abuse of a child but contends the trial court committed prejudicial error when it refused his requested jury instruction on the burglary allegation that the prosecutor had the burden of proving defendant did not have consent to enter the home. The proposed instruction defined consent to enter as permission to enter given by a lawful occupant with knowledge of the defendant's felonious intent. Over defendant's objection, the trial court instead instructed the jury as follows: "It is not a defense to [the] burglary allegation that the child may have consented to the sexual act, or that the child may have consented to the entry into the residence."

5

The trial court found that because S. at age 13 could not consent to the sexual acts that took place in the residence she could also not give valid, knowing consent for defendant to enter the residence with the intent to commit those felonious acts, and therefore her consent was not a defense to the burglary allegations. To evaluate the ruling, we review the circumstances in which courts have recognized a consent defense to burglary. We uphold the court's refusal to give the requested instruction based on a slightly different rationale than the one it articulated.

Burglary is defined section 459 in relevant part as follows: "Every person who enters any house, room, [or] apartment [or other specified structures] . . . with intent to commit . . . any felony is guilty of burglary. . . ." Section 460, incorporated by reference in section 667.61, subdivision (d)(4), specifies that every burglary of an inhabited dwelling house is a first degree burglary. Until the 1975 decision in *People v. Gauze* (1975) 15 Cal.3d 709 (*Gauze*), section 459 was interpreted according to its plain language to mean *any* entry with the intent to commit a felony into one of the structures enumerated in the statute constituted burglary *regardless of the circumstances of the entry*. (*People v. Salemme* (1992) 2 Cal.App.4th 775, 779 (*Salemme*) and cases cited therein.) In *Gauze*, the Supreme Court reexamined the common law underpinnings and statutory intent of section 459 in order to decide whether a person burglarized his own apartment when he entered it with the intent of shooting one of his roommates. (*Gauze*, at pp. 711–714.)

Burglary at common law was defined as " 'the breaking and entering of the dwelling of another in the nighttime with the intent to commit a felony.' " (*Gauze, supra*, 15 Cal.3d at p. 711, italics omitted.) The court in *Gauze* noted the codification of common law burglary and subsequent revisions and amendments preserved the spirit of the common law crime which was to protect the right to peaceful occupancy free of invasion. (*Id.* at pp. 712–713.) Despite its elimination of the "breaking" and nighttime entry requirements, and the expansion of the types of buildings protected, section 459 retained two salient aspects of common law burglary throughout its evolution: the entry must invade a possessory right in a building and must be committed by a person who has

6

no right to be in the building. (*Gauze*, at p. 714.) From this, the court concluded the defendant in *Gauze* could not be guilty of burglarizing his own home since he had an absolute right to enter the apartment that was not conditioned on the consent of his roommates. (*Ibid.*) The court stated: " 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. *The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.'* Section 459, in short, is aimed at the danger caused by the unauthorized entry itself." (*Id.* at p. 715, italics added.) Since Gauze's entry into his own apartment did not create any danger over and above that created by his decisions to borrow a gun and use it for an assault, application of the burglary statute added nothing to the victim's protection. (*Gauze,* at p. 716, fn. 5.)

Gauze did not overrule earlier cases upholding burglary convictions in which there was consensual entry. (*People v. Pendleton* (1979) 25 Cal.3d 371, 382 (*Pendleton*).) Thus, "[t]he law after *Gauze* is that one may be convicted of burglary even if he enters with consent, provided he does not have an *unconditional possessory right* to enter." (*Ibid.*, italics added.) The basis for excluding consent as a defense to burglary was explained in *People v. Talbot* (1966) 64 Cal.2d 691 (*Talbot*):[2] "The underlying theory of the cases holding that consent to the entry is not a defense to a charge of burglary in this state is that since burglary is defined as an entry with the specified evil intent, it is an integral offense, indivisible into ingredients, and that consent cannot be made to relate to entry alone as a constituent ingredient." (*Talbot,* at p. 700.) Nonetheless, *Talbot* opened

---

[2] *Talbot* was overruled on other grounds in *People v. Ireland* (1969) 70 Cal.2d 522, 540 and *People v. Wilson* (1969) 1 Cal.3d 431, 442.

the door to a very narrow set of circumstances in which consent can be a defense to burglary.

The defendant in *Talbot* asserted a consent defense to burglary based on the fact his accomplices had invited him into their house for the purpose of robbing and murdering their houseguest. (*Talbot, supra*, 64 Cal.2d at pp. 697–698, 699–702.) The court reframed the asserted defense as follows: "[I]f the one in possession of the property gives consent to the entry with knowledge that the person entering intends to commit a felony therein, the consent relates to all the ingredients and therefore constitutes a defense." (*Id.* at p. 700.) The Supreme Court noted the novelty of this defense, but did not reach its merits, finding that the persons in possession of the house had in fact withdrawn their consent for the planned felony before the defendant entered the house with the intention of carrying it out. (*Id.* at pp. 700–702.)

Two later cases have expressly recognized the limited consent defense raised in the *Talbot* case. In *People v. Superior Court* (*Granillo*) (1988) 205 Cal.App.3d 1478 (*Granillo*), undercover officers set up a sting operation by moving into an apartment and inviting the defendant to enter the apartment in order to sell stolen goods to the officers. (*Id.* at pp. 1480–1481.) The defendant was charged with burglary based on his entering the apartment with the felonious intent to sell stolen property. (*Id.* at p. 1480.) The Court of Appeal upheld the dismissal of those charges, stating: "As the court in *Gauze* explained, the burglary law is designed to protect a possessory right in property against intrusion and the risk of harm. [Citation.] Granillo was not an intruder, nor did any danger to personal safety arise from his mere entry. He entered, not only with the officer's informed consent, but also with his . . . own knowledge that Cantu was operating out of his apartment as a fence. Indeed, the officer did more than *consent* to Granillo's entry; he *invited* him to his apartment. The visit was fully orchestrated by the authorities in an effort to catch criminals in the act and recover stolen property. Thus, to say Granillo could be found guilty of burglary would be contrary to the primary basis of the burglary law." (*Id.* at p. 1485; see also *People v. Thomas* (1977) 74 Cal.App.3d 320

8

(*Thomas*) [burglary conviction reversed where alleged victim was a fence and invited the defendant to break into his store and remove certain agreed items].)

The *Granillo* informed consent defense was also recognized in *People v. Sherow* (2011) 196 Cal.App.4th 1296, in which the defendant was charged with three burglary counts for entering a pawnshop on three different days to sell stolen DVD's. His defense was that the pawnshop owner had consented to his entry with full knowledge he was selling stolen DVD's. (*Id.* at pp. 1302–1303.) The trial court instructed the jury that the burden was on the defendant to prove by a preponderance of the evidence that he entered with the informed consent of the pawnbroker. (*Id.* at p. 1303.) The Court of Appeal reversed, holding the defendant need only raise a reasonable doubt the pawnbroker had consented to the entry with knowledge of the felonious intent. (*Id.* at pp. 1305–1307.) Defendant here contends he was entitled to the equivalent instruction.

*In re Andrew I.* (1991) 230 Cal.App.3d 572 (*Andrew I.*) involved a somewhat different fact pattern. Andrew was a juvenile who was invited by his friend Scott to enter the home of Scott's mother for the purpose of stealing some valuables. (*Id.* at p. 577.) Scott had left the home one or two weeks earlier and not returned. (*Id.* at p. 576.) Andrew was arrested after the theft and a residential burglary allegation against him was found true in the ensuing juvenile proceeding. (*Ibid.*) The Court of Appeal affirmed the burglary finding. Based on *Gauze* and *Pendleton*, the court dismissed the notion that Andrew had any possessory interest in or right to enter the victims' residence or that the mere fact Scott invited him inside would offer any defense to burglary. (*Andrew I.*, at p. 578.) Citing *Granillo* and *Thomas*, Andrew contended there was no illegal entry because Scott invited Andrew in knowing he intended to commit theft. (*Andrew I.*, at p. 578.) The Court of Appeal distinguished these cases as follows: "In both cases, no issue existed with respect to the possessor's control of the premises. Here, the evidence established Scott did not have an unconditional possessory interest in his mother's residence. Scott had left home one or two weeks before the crime occurred. In fact, Scott's alleged original purpose in returning to the residence was to pick up clothes he had left behind." (*Id.* at p. 579.) *Andrew I.* also rejected claims that Scott acquired a

9

possessory interest in his mother's home because his mother had an obligation to support him, or because he had implied permission to enter the home. (*Ibid.*) The court observed that "[p]ermission to enter, whether express or implied, does not confer upon the entrant an unconditional possessory interest in the premises." (*Ibid.*)[3]

Thus, in *Salemme*, the Court of Appeal summarized the crime of burglary and the defenses thereto as follows: "[S]ince burglary is a breach of the occupant's possessory rights, a person who enters a structure enumerated in section 459 with the intent to commit a felony is guilty of burglary *except* when he or she (1) has an unconditional possessory right to enter as the occupant of that structure or (2) is invited in by the occupant who knows of and endorses the felonious intent." (*Salemme, supra*, 2 Cal.App.4th at p. 781.)[4] The only issue in this case is whether the second exception applies since it is clear defendant had no unconditional possessory right to enter the house.

In our view, the trial court was correct in determining the second, "informed consent" exception also had no application to the facts of this case. (See *Granillo*, *supra*, 205 Cal.App.3d at p. 1486 [there must be "evidence of informed consent to enter coupled with the 'visitor's' knowledge the occupant is aware of the felonious purpose and does not challenge it"].) The exception does not apply because, as a 13-year-old minor living in her father's house, S. had no authority to invite persons into the house for felonious purposes.

---

[3] The *Andrew I.* court cited *In re Richard M.* (1988) 205 Cal.App.3d 7, 15, which rejected a claim that a juvenile who had escaped from a court-ordered residence at a youth center and broken into his parents' home with the intent to steal could not be guilty of burglarizing his parents' residence because he had possessory right of habitation in the home.

[4] This statement must be qualified to account for cases holding that one occupant of a home cannot give permission for an intruder to enter in order to commit a felony against a second occupant. (See *People v. Sears* (1965) 62 Cal.2d 737, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17; *People v. Clayton* (1998) 65 Cal.App.4th 418.) Further, as discussed below, a minor "occupant" in her parent's home does not have the same unconditional possessory right to allow others to enter the home as her parent does.

"Minor children . . . do not have coequal dominion over the family home. [Citation.] Although parents may choose to grant their minor children joint access and mutual use of the home, parents normally retain control of the home as well as the power to rescind the authority they have given." (*People v. Jacobs* (1987) 43 Cal.3d 472, 482 (*Jacobs*) [holding 11-year-old did not have authority to permit plain clothes police officers to enter and search the home].) It is true as defendant contends that *Jacobs* created no per se rule that a minor child lacks authority to consent to a police search. The case recognized that "[i]n some circumstances, a teenager may possess sufficient authority to allow the police to enter and look about common areas." (*Id.* at p. 483.) But that limited exception in the Fourth Amendment search context does not mean S.'s consent presented a factual issue that had to be resolved by the jury.[5] There was simply no evidence in this case that S. had her father's permission to invite an adult male into her room knowing he intended to have unlawful sexual relations with her. To the contrary, the evidence showed S. and defendant went to great lengths to conceal defendant's presence from her father—he arrived late at night and left early in the morning, he parked his truck where S.'s father would not notice it, he entered and exited through a window, he hid in the closet when they heard S.'s father coming downstairs. S.'s father testified S. had to ask his permission to have anyone over. S. testified she believed her father might attack and try to kill defendant if he found him in the house.

Defendant's explanation of this evidence is telling: "The fact that [S.] suggested that Tackwell climb through the window did not mean she lacked authority to allow visitors in her room. Instead, it showed that she was fearful such authority would be rescinded by her father." This is an oblique admission that (1) S. in fact needed her father's permission to invite any visitor into the house, and (2) whatever implied

---

[5] Fourth Amendment jurisprudence involves " ' " 'balancing [a search's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " ' " (*People v. Robinson* (2010) 47 Cal.4th 1104, 1120, quoting *Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 652–653.) Entry for purposes of committing a felony involves no countervailing social benefits so there is less reason to construe consent to such entry liberally.

permission S. believed she had to invite visitors she knew that permission did not extend to inviting an adult male to sleep over with her in her room.

No jury instruction on consent was required on the facts of this case. (*People v. Moon* (2005) 37 Cal.4th 1, 30 [court may refuse proffered instruction if it incorrectly states the law or is not supported by substantial evidence]; *People v. Flannel* (1979) 25 Cal.3d 668, 684–685, overruled on another ground in *In re Christian S.* (1994) 7 Cal.4th 768, 777 [court may refuse requested instruction on defense for which there is minimal and insubstantial evidence].) Moreover, any assumed error in not giving the instruction was harmless. No rational jury would have determined that S. had express or implied permission from her father to consent to defendant's entry for purposes of engaging in unlawful sexual relations with her. (See *People v. Felix* (1994) 23 Cal.App.4th 1385, 1400 [finding counsel's failure to request jury instruction on consent to burglary harmless due to complete lack of evidence supporting the defense].)

The result we reach is consistent with the purposes of the burglary law. As noted earlier, the burglary law is " 'primarily designed . . . not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to public safety.' " (*Gauze*, *supra*, 15 Cal.3d at p. 715.) It is "aimed at the danger caused by the unauthorized entry itself." (*Ibid.*) That danger clearly existed in this case. S. testified she feared her father would attack defendant and try to kill him with an axe if he discovered his presence in the house. Neither S.'s invitation for defendant to enter, nor the fact that his intended felony was committed against the daughter rather than the father defused the risk of harm and violence stemming from his intrusion into the home.

While no California cases directly address the issue before us, we note that our holding is consistent with decisions from other jurisdictions. *State v. Brown* (N.C. Ct.App. 2006) 626 S.E.2d 307 involved very similar facts. A 45-year-old defendant met a 13-year-old female over the Internet. (*Id.* at p. 310.) The two arranged for her to sneak him into her bedroom for the purpose of engaging in sexual relations on three occasions. (*Id.* at pp. 310–311.) After being convicted of first-degree burglary and

12

sexual offenses, the defendant claimed there was insufficient evidence to support his burglary conviction. (*Id.* at p. 311.) The court rejected this claim: "[A] child who has a room in his or her parents' house does not have unlimited authority to allow entry to visitors. [Citation.] Courts considering consent to entry given by a son or daughter have focused on the purpose of the entry and whether the child had authority to consent to entry for that purpose." (*Id.* at p. 312; see also *People v. Martin* (Ill. Ct.App. 1983) 449 N.E.2d 1039, 1041 [minor could not authorize entry in father's house for unlawful purposes].) There is no evidence in the record S. had the authority from her father to allow an adult male to sleep over in her bedroom and have sexual relations with her, and no rational jury could have so found if instructed on informed consent as a defense to burglary.

We do not adopt the trial court's view that because S. at age 13 was not legally capable of consenting to the sexual acts that took place in the residence she could not, as a matter of law, give informed consent for defendant to enter the residence with the intent to commit those acts. While the Legislature has adopted a conclusive statutory presumption that minors under age 14 cannot give legal consent to sexual acts with adults (*People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 11), we are not persuaded the same rationale—to protect children of tender years—carries over into the law of burglary, which is concerned with the dangers to occupants presented by unauthorized entry. We nonetheless affirm the court's ruling and the ensuing judgment.

## III.  DISPOSITION

The judgment is affirmed.

13

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.