[Crim. No. 5659.    First Dist., Div. Two.    Apr. 28, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD L. RAINE, Defendant and Appellant.

518

Allen B. Ellis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, John T. Murphy and Horace Wheatley, Deputy Attorneys General, for Plaintiff and Respondent.

AGEE, J.—Defendant appeals following jury conviction of second degree burglary (Pen. Code §§ 459, 460) and five counts of forgery (Pen. Code § 470). His main contention is that certain evidence used to convict him was obtained by an illegal search and that, without such evidence, the testimony of his accomplice was not sufficiently corroborated as required by Penal Code section 1111.[1]

Seymore, the accomplice, testified that he and appellant broke into the Dennis Roofing Company, in Richmond, about midnight on December 22, 1964. They took a television set, some credit cards and identification cards issued to Gilbert or Delphine Dennis, numerous keys and tools, and some blank company bank checks, several of which appellant filled out while still on the burglarized premises.

The next day appellant and his wife cashed four of these checks at four different stores in Walnut Creek. Seymore used a fifth check to buy a used car. The forgery counts are based on these five transactions.

On the evening of March 10, 1965, appellant's wife requested a room for two persons at the Tahoe Sands Motel. She signed the registration card as "Mrs. D. Dennis," of "Dennis Roofing Co.," and gave her residence address as 1378 Thomas Road, Phoenix, Arizona. She was assigned to Room 24. Nothing in advance was paid or requested.

By the next evening the motel manager had become worried about the bill, particularly because of the size of the charges incurred for food and beverages. A phone call to Phoenix disclosed the fact that there was no "Mrs. Dennis" at the address given.

The office of the Sheriff of El Dorado County was then asked to check on the occupants' MG automobile. Investigation disclosed that it was a stolen car.

About 6:30 the next morning, March 12, deputy sheriffs went to Room 24 and arrested the occupants, appellant and his wife, for car theft. The arrest was made without a warrant but there is no contention that it was unlawful.

The motel manager thereafter phoned the sheriff's office and asked the deputy who answered to inquire about payment of the bill, which totaled $78. While holding the phone, he

---

[1]The section provides in pertinent part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

heard appellant's wife say, "We don't have a dime." When the deputy came back on the line, he advised the manager that "they weren't going to be able to pay it [the bill]."

About 9 or 9:30 that same morning, the officers returned to the motel and asked to be allowed to search Room 24. The manager gave his consent, unlocked the door, and entered with them. Some of the credit cards and identification cards taken in the Dennis burglary were found hidden behind a baseboard which had been pulled slightly away from the wall. These cards are the evidence which appellant contends were obtained by means of an illegal search.

After the search the manager had the maid remove and store the occupants' belongings. The room was then prepared for the next occupancy. Three months later the appellant paid the bill and retrieved the belongings.

### Legality of Search

The search was made without a search warrant and was not incident to the arrest; neither appellant nor his wife expressly or impliedly consented to the search; there is nothing in the record which would justify a belief by the officers that the motel manager was authorized by appellant or his wife to permit such a search. (See *Stoner* v. *California* (1964) 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889].)

Under such circumstances the search was lawful only if the right of appellant and his wife to the occupancy of the room had then terminated.

Appellant asserts that the "tenancy did not terminate until 11:00 a.m., on March 12," the day of the arrest and search. Such conclusion is based entirely upon the implication arising from the fact that this was the motel's daily checkout time.

The manager testified that a request for payment could be made at any time and that, if "these people hadn't been arrested that morning," he "would have went in and said, we want our money."

It is our opinion that if the reply to such request had been that "we don't have a dime" and are not "going to be able to pay," the manager would have had the right to require appellant and his wife to give up their occupancy of the room.

The actual situation is parallel. While the request for payment was made by telephone and only appellant's wife was contacted, she was the only person with whom the motel had dealt. In fact, appellant himself was never seen by any of the motel personnel until the time of his arrest. We think that the circumstances sufficiently show that appellant had authorized

his wife to act for him in connection with their tenancy of the motel room.

Furthermore, when a day-to-day room guest of a hotel or motel departs without any intention of occupying the room any longer and without making any arrangement for payment of his bill, an inference arises that he has abandoned his tenancy. In such a situation the management should not be required to wait until checkout time to reoccupy the room to the exclusion of such guest. This is so even though the guest leaves some of his personal belongings behind.

The above generalization is without doubt applicable to a voluntary departure and, while the departure here was involuntary, it was occasioned by a *lawful* arrest. We see no reason to distinguish between these two situations, particularly when appellant and his wife made no effort to arrange to pay the bill even after being contacted by the motel manager.

Under the circumstances of this case, as detailed above, we hold that the manager regained the right to complete control of Room 24 upon the departure of appellant and his wife and, therefore, his consent to the search made it lawful. (See *People* v. *Crayton*, 174 Cal.App.2d 267, 269 [344 P.2d 627].) The evidence obtained thereby is therefore admissible.

In view of this holding, it is unnecessary to detail the additional corroborating evidence. Such evidence includes proof that appellant pawned the television set, hid the keys in a trailer, and wrote out the subject checks on blanks obtained in the burglary.

In addition to accomplice Seymore and the witnesses who testified as to the motel episode, the prosecution called seven factual witnesses and one handwriting expert. Their testimony, standing alone, overwhelmingly proves appellant's guilt of each of the six counts. In our opinion there is no reasonable possibility of a different result even if the motel evidence were to be excluded.

### Prosecution's Use of Wife's Confession

Appellant called his wife as a witness. She had previously given a tape-recorded confession to the police and, in a separate action, had pleaded guilty to cashing three of the checks which appellant is charged with forging. No contention is made that this confession was not in all respects validly obtained. (Cf. *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].)

In her confession, the wife stated that appellant gave her

the three checks, directed her to the stores where she cashed them, waited outside in his car while she was doing so, and received from her the merchandise and cash which she had thereby obtained.

At the trial, however, the wife testified that it was Seymore who gave her the checks which she had cashed and that appellant did not participate in or have any knowledge of the commission of these offenses.

On rebuttal, the prosecution sought to impeach the wife by playing those portions of the tape recording which related to her testimony at the trial. The right to impeach a witness "by evidence that he has made, at other times, statements inconsistent, with his present testimony" is recognized by statute. (Code Civ. Proc. § 2052, as then in existence.)

Defense counsel objected to the admission in evidence of the *entire* recording, stating that "it's our position that as to the matters which are collateral and which were not mentioned in the foundation, the tape would be inadmissible as improper impeachment." The court recognized the merit of this objection, stating that "I understood there were some things which had to do with some matters which were not the subject matter of this trial, which he [the prosecutor] was not going to play." The prosecutor replied: "That is correct, Your Honor."

The court then stated: "I'll overrule the objection and I will admit the recording as to matters which the witness has been examined on here, and it will be admitted for a limited purpose of impeachment."

The court then addressed the following explanation to the jury: "Ladies and gentlemen, it's not offered for the purpose of proving the truth of any statements that occurred in there, but it's offered for the purpose of tending to impeach the testimony of the witness here, Mrs. Raine, in the respect that it would tend to show she's made statements other times inconsistent with her present testimony. For that limited purpose only, I will admit the tape."[2]

---

[2]Likewise, in its formal charge to the jury, the court gave the following instruction: "In respect to any attempt to impeach a witness by showing that on some former occasion he made a statement or statements that are contradictory of his testimony here, you are instructed that the evidence of any such contradictory statements is not received for the purpose of proving the truth of what then was said, but only for the purpose of testing the credibility of the witness; you are permitted to consider such evidence only for that purpose, and you are the exclusive judges of the effect of such evidence on the witness's credibility."

The jury was then excused temporarily and the tape was played for the dual purpose of having the officer who conducted the interview verify that it was an accurate recording of the entire interview and, in the words of defense counsel, to settle "the question of which parts, I think perhaps that should be gone into with the officer, so we might explain to him which parts are going to be played and which aren't."

Following the above proceedings the jury was returned to the courtroom. Appellant's counsel stated that "it's been agreed the district attorney will stipulate there are small portions of this tape which are not admissible. If that's the understanding, I would like to ask the district attorney remain close enough to intercept those before—." The court interrupted, stating: "I don't think you ought to be telling the district attorney where he can stand in the courtroom . . . . There has been an understanding and when you come to those parts, of course he'll turn the machine off."

It is presumed that this procedure was followed and that only those parts of the recording agreed upon were played in the presence of the jury. The court reporter did not record the portions that were played to the jury and therefore there is no way to ascertain from the record what portions were deleted.

However, the appellant's attorney was well aware of which portions were to be excluded[3] and, if the "understanding" referred to by the court was not followed to the letter, we are certain that the record would reveal a protest by him. We would also expect that such an incident would be raised on motion for a new trial but no such motion was made. We reject appellant's suggestion that the "understanding" may have been violated.

### Applicability of People v. Aranda

On appeal, appellant's court-appointed attorney makes the contention that the prosecution's use of the wife's taped statement in "otherwise permissible impeachment efforts" is not justified here because such statement was "made by an alleged partner in crime [and] was a confession

---

[3]The tape recording contains the following statements which would not bear on impeachment: appellant had stolen the car in which they drove to cash the checks in Walnut Creek; that prior to being arrested at the motel, she and appellant had traveled to Fresno, Phoenix, and Miami, and had continued to pass forged checks which appellant had stolen from either the Dennis Roofing Company or other businesses; and that appellant mistreated her and forced her to travel with him somewhat against her will.

tending to incriminate the appellant as to those same criminal acts confessed to [by her]."

Appellant likens the situation here to that in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], wherein Aranda and Martinez were jointly tried and convicted. The confession of Martinez, that he and Aranda had committed the robbery charged, was admitted in evidence against Martinez only and the jury was so instructed. The Martinez conviction was reversed on *Dorado* grounds and the Aranda conviction was reversed because of the prejudicial effect of the Martinez confession upon Aranda's defense.

Our Supreme Court held that, when the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant which implicates a codefendant, the trial court is required to (1) delete all parts of the statement which implicate the codefendant, if this can be done without prejudice to the declarant, *or* (2) grant a severance of trials, *or* (3) exclude the entire statement if effective deletions cannot be made.

The second alternative requirement was met here, in effect, by trying the appellant alone. There was thus no violation of the *Aranda* rule even though we were to accept the premise that appellant's wife should be treated as though she were a codefendant.

Moreover, appellant himself created the situation of which he now complains. By calling his wife as a witness, he subjected her to cross-examination and the impeachment which ensued. We find no error in the use of her confession to effect such impeachment.

### Prosecutor's Comment on Tape Recording

■ Appellant lastly complains of two instances where the prosecutor, in his argument to the jury, alluded to certain portions of the taped statement as being evidence of appellant's guilt rather than being relevant only to the credibility of appellant's wife.

In the first instance, the prosecutor made the following statements: "Now as you will recall, Mrs. Raine testified that she got the checks and the credit cards from Seymour, that she cashed them by herself while the defendant was off visiting his cousin in Pittsburg; that the defendant knew absolutely nothing about the checks and that the defendant knew absolutely nothing about the credit cards or about her concealing them in the motel room . . . .

"Mrs. Raine further *testified, on the tape* this is now, in

rebuttal of her testimony, that the defendant gave her the checks one at a time; that she recognized the defendant's handwriting; that the defendant remained in the car while she cashed most of the checks and that upon her return to the car she gave the money to the defendant.'' (Italics supplied.)

The above use of the word ''testified'' was unfortunate, but, in our opinion, it could not possibly have resulted in leading the jury to believe that the unsworn statement made by appellant's wife outside the courtroom was to be treated as evidence of appellant's guilt. (See also, footnote 2, *infra*.)

In fact, when the prosecutor first referred to the tape recording, he said: ''To disprove this, *to impeach* Mrs. Raine's testimony, the People offered . . . .'' (Italics supplied.)

In the second instance complained of, the prosecutor stated: ''Now, Mr. Lord [defense counsel] then talks about Mrs. Raine's state of mind when she talked to Officer Holcomb and also her state of mind here in the Courtroom.

''Now the state of mind of Mrs. Raine seems to have become quite important and I submit to you, ladies and gentlemen, that as evidence of that state of mind, in the tape recording are two things. Mrs. Raine expresses a fear that the defendant will find out that she is giving this tape.

''Mrs. Raine further states that when the defendant told her about presenting the checks, cashing the checks, that she objected and the defendant began to swear at her and she stopped. Now, I submit to you, ladies and gentlemen, that this woman is terrified of her husband and that on the witness stand she testified the way she did because she was terrified; that [when she was giving the recorded statement] she was away from her husband and his influence and talked to Officer Holcomb and she told the truth and the whole truth.''

There is nothing improper in the above argument. It was directed to the impeachment of the wife's testimony by her prior inconsistent statement and was in response to defense counsel's argument that, at the time she gave said statement, she was not in a physical or mental condition to do so.

Moreover, no such claim of misconduct was ever made to the trial court. ▇ The general rule is that such issue may not be raised on appeal for the first time. (*People* v. *Ney* (1965) 238 Cal.App.2d 785, 790 [48 Cal.Rptr. 265].)

Exceptions to this rule are recognized where, assuming misconduct by the prosecutor, the case is closely balanced and presents grave doubt of a defendant's guilt and the misconduct contributed materially to the verdict, or the harmful

effect of the misconduct could not have been obviated by a timely admonition to the jury. (*People* v. *Ney, supra,* p. 790.)

Neither of these two exceptions to the general rule is present in the instant case.

Judgment affirmed.

Shoemaker, P. J., and Taylor, J., concurred.

A petition for a rehearing was denied May 26, 1967.