[Crim. No. 11434. First Dist., Div. One. Sept. 10, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE ANTHONY ROBINSON, Defendant and Appellant.

**COUNSEL**

Warren E. George, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Gloria F. DeHart and James M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOLINARI, P. J.**—Defendant appeals from the judgment upon a conviction of murder in the first degree (Pen. Code, § 187). He contends that each of four separate searches were illegal as violative of the Fourth Amendment and that the trial court committed prejudicial error in its instructions with respect to felony murder. We find these contentions to be without merit and hence the judgment must be affirmed.

### Background Facts

On Sunday, March 12, 1972,[1] a body was found on a road in Solano County. There were numerous tire tracks running to and over the body. Next to the body on the side of a dirt mound there was a tire track with the lettering "LTT." An autopsy disclosed three bullet wounds and the cause of death was determined to be multiple wounds with hemorrhage. Two bullets were removed from the body and their caliber determined to be .32. The next morning, March 13, the deceased was identified as Richard Dewey. Dewey was a friend of a Mrs. McJoy and he would usually visit her on weekends. He did not visit her on the weekend of March 11-12.

Defendant lived at the home of Mrs. McJoy. On Saturday night, March 11, defendant left the McJoy home and did not return until 6:30 or 7 a.m. the next morning.

### Preliminary Statement

Defendant claims that evidence obtained in the course of four searches which he alleges were unconstitutional was erroneously admitted at the trial. Defendant has attacked the validity of these searches pursuant to a motion made as provided in Penal Code section 1538.5.[2] ■ In considering the validity of the searches we must consider the evidence adduced at the hearing of this motion. (*People* v. *Gibbs,* 16 Cal.App.3d 758, 761 [94 Cal.Rptr. 458]; *People* v. *Superior Court (Mahle)* 3 Cal.App.3d 476, 482, fn. 3 [83 Cal.Rptr. 771]; *Thompson* v. *Superior Court,* 262 Cal. App.2d 98, 103 [68 Cal.Rptr. 530].) Accordingly, the facts we set out in connection with our discussion of these searches are those adduced at the section 1538.5 hearing.

[1] Unless otherwise indicated all dates have reference to the year 1972.

[2] Unless otherwise indicated all statutory references hereinafter made are to the Penal Code.

## The First Search

Sergeant Gaston of the Sacramento Police Department testified he went to the home of Mrs. McJoy in Sacramento because he received information from Sergeant Lundblad of the Solano County Sheriff's office "that Mrs. McJoy had some possible information, possible murder weapon in this matter." Gaston knew that there had been a murder and had been informed that the victim had visited Mrs. McJoy's home and that they were friends. He also had been informed that the victim had been shot with a .32 caliber weapon.

When Gaston arrived at the McJoy residence he asked Mrs. McJoy if she had mentioned a gun to Sergeant Lundblad and she indicated she had. Gaston asked her to show him the gun. She went to a box outside on her front porch, removed the cover and pulled out a coat. Mrs. McJoy handed Gaston the coat and said "The gun is in the pocket." She told him she had "touched" the gun and that she had "found it." Gaston did not know to whom the coat belonged but felt that it did not belong to Mrs. McJoy. After Mrs. McJoy handed the coat to Gaston she told him the coat belonged to defendant. Mrs. McJoy told Gaston she was putting defendant's belongings out on the porch because he had promised to pay her for staying at her house and had not done so. She did not want him staying there any longer so she moved his things onto the porch for him to pick up when he came.

Gaston could feel a heavy object in the coat pocket. Based on his previous experience it seemed to him that the object had the same weight as a gun. He removed the gun carefully trying not to destroy any possible fingerprints. He observed that the gun was a .32 caliber weapon. Gaston put the gun back into the coat pocket and took the coat back with him to the police department. At the police station Gaston removed the gun from the coat and upon checking it he found that it contained four spent casings. Gaston then proceeded to search the pockets of the coat for inventory purposes. This search revealed a number of personal items, and included two sets of keys. Gaston, at no time, had a search warrant.

Sergeant Lundblad subsequently checked the two sets of keys found in the coat pocket. These keys fit the post office box of the victim, his place of employment, a lock to his tool box, and one key on each of the rings fit the front door of the victim's apartment.

In the absence of a warrant the burden is on the People to justify the search. (*Guidi* v. *Superior Court,* 10 Cal.3d 1, 15, fn. 15 [109 Cal. Rptr. 684, 513 P.2d 908]; *People* v. *Gale,* 9 Cal.3d 788, 795 [108 Cal.

Rptr. 852, 511 P.2d 1204]; *People* v. *Superior Court (Simon)* 7 Cal.3d 186, 192 [101 Cal.Rptr. 837, 496 P.2d 1205]; *Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 23].) However, in determining the reasonableness of police conduct as restricted by the Fourth Amendment "There is no exact formula . . ." and "Each case must be decided on its own facts and circumstances [citations]—and on the total atmosphere of the case." (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].) It should also be noted that that exclusionary rule was developed to deter lawless enforcement of the law and the invasion of an individual's privacy by the police without the obtaining of a search warrant. (*Linkletter* v. *Walker,* 381 U.S. 618, 636-637 [14 L.Ed.2d 601, 612-613, 85 S.Ct. 1731]; *People* v. *Cahan,* 44 Cal.2d 434, 447-449 [282 P.2d 905, 50 A.L.R.2d 513].)

■ We have concluded that under the totality of the circumstances the police acted reasonably in searching the coat in question and in seizing it and its contents. We first observe that defendant's right of privacy was originally invaded by Mrs. McJoy. It was she and not the police who removed defendant's belongings to the front porch and it was Mrs. McJoy who first discovered and observed the gun. At that time she was not acting as an agent of the police. The police did not go of their own volition to the McJoy home but were summoned there by Mrs. McJoy after she had discovered the gun.

■ The protection of the Fourth Amendment against unreasonable searches and seizures applies only to governmental action and not to evidence obtained by a private person not employed by or associated with a governmental unit or agency. (*Burdeau* v. *McDowell,* 256 U.S. 465, 475 [65 L.Ed. 1048, 1050-1051, 41 S.Ct. 574, 13 A.L.R. 1159]; *People* v. *Superior Court (York)* 3 Cal.App.3d 648, 659 [83 Cal.Rptr. 732]; *People* v. *Garber,* 275 Cal.App.2d 119, 126 [80 Cal.Rptr. 214] [cert. den., 402 U.S. 981 (29 L.Ed.2d 146, 91 S.Ct. 1643)]; *People* v. *Katzman,* 258 Cal.App.2d 777, 786 [66 Cal.Rptr. 319].)

We observe, moreover, that the search and seizure may be upheld on the basis of Mrs. McJoy's consent. ■ The applicable rule is that a search is not unreasonable when made with the consent of a third party whom the police reasonably and in good faith believe to have authority to consent. (*People* v. *Carr,* 8 Cal.3d 287, 298 [104 Cal.Rptr. 705, 502 P.2d 513]; *People* v. *McGrew,* 1 Cal.3d 404, 412 [82 Cal.Rptr. 473, 462 P.2d 1] [cert. den., 398 U.S. 909 (26 L.Ed.2d 67, 90 S.Ct. 1689)]; *People* v. *Hill,* 69 Cal.2d 550, 554-555 [72 Cal.Rptr. 641, 446 P.2d 521] [cert. granted, 396 U.S. 818 (24 L.Ed.2d 68, 90 S.Ct. 112), affd. 401 U.S.

797 (28 L.Ed.2d 484, 91 S.Ct. 1106)]; *De Conti* v. *Superior Court,* 18 Cal. App.3d 907, 910 [96 Cal.Rptr. 287]; *People* v. *Superior Court (York) supra,* 3 Cal.App.3d 648, 654.)

The good faith of Sergeant Gaston is not questioned. The issue is whether Gaston could reasonably believe that Mrs. McJoy had the authority to consent to a search of defendant's coat. We have concluded that under the circumstances of this case Gaston could reasonably believe that Mrs. McJoy had the authority to permit him to search the coat for a gun she had previously observed in the coat. When Mrs. McJoy handed Gaston the coat which she procured from a box on her front porch she told Gaston that she had put defendant's belongings on the porch because he had not paid her for staying at her home as he had promised.

In *People* v. *Superior Court (York) supra,* 3 Cal.App.3d 648, the landlord of a furnished apartment told the police that tenants of the apartment were being evicted for nonpayment of rent and that while the furniture was being moved out she observed what appeared to be a bowl of marijuana. The landlord invited the police to the premises to "take a look." The police, acting on this invitation, entered the apartment where they observed a bowl containing plastic bags of a material that appeared to be marijuana. The appellate court, in annulling an order suppressing the evidence, stated: "It is our view that at least for purposes of the Fourth Amendment a landlord who has evicted his tenant for nonpayment of rent has the authority to consent to an entry by the police into the premises in order to seize contraband discovered by the landlord in the course of the eviction." (At p. 657.) (See *People* v. *Raine,* 250 Cal.App.2d 517, 521 [58 Cal.Rptr. 753].)

In such a situation the police are not called upon to determine whether the landlord acted legally in taking the defendant's private property. (*People* v. *Superior Court (York) supra,* 3 Cal.App.3d 648, 658, 660; *De Conti* v. *Superior Court, supra,* 18 Cal.App.3d 907, 910; *People* v. *Jackson,* 14 Cal.App.3d 57, 68 [92 Cal.Rptr. 91].) As observed in *Jackson,* "Policemen are not required to be experts in the law of landlord and tenant." (At p. 68.)

Accordingly, Gaston was justified in removing the gun from the coat. Upon its removal he ascertained that it was a .32 caliber weapon. He had previously been advised by Sergeant Lundblad that the victim had been shot with a .32 caliber gun. He also had been advised that the victim had visited the McJoy home. He was also told by Mrs. McJoy that defendant had been staying at her house and that the coat belonged to him.

Under these circumstances Gaston was justified in determining whether the gun was the one used in the killing and whether the coat in which the gun was carried was evidence having a connection with the homicide. (See *People* v. *Miller,* 245 Cal.App.2d 112, 140 [53 Cal.Rptr. 720].)

There can be no question that Gaston would have been justified then and there in inspecting the gun to see whether there were any bullets in the chamber and whether the gun had been recently fired and in searching through the pockets of the coat to ascertain whether it contained any other articles of contraband. We observe that it is plainly within the realm of police investigation to subject articles properly seized to scientific testing and examination. (*People* v. *Teale,* 70 Cal.2d 497, 508 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Jackson,* 3 Cal.App.3d 921, 940 [83 Cal. Rptr. 829]; *People* v. *Rogers,* 241 Cal.App.2d 384, 388-390 [50 Cal.Rptr. 559].) The search conducted at the police station was a continuation of the search lawfully begun at the McJoy home in the light of the totality of the circumstances. (*People* v. *Teale, supra,* at p. 512; *People* v. *Williams,* 67 Cal.2d 226, 230 [60 Cal.Rptr. 472, 430 P.2d 30]; *People* v. *Webb,* 66 Cal.2d 107, 126 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708].) As observed in *Williams,* "Since the officers could lawfully have taken possession of the evidence at the scene of the initial search, the fact that for reasons of convenience they actually did so at a different time and place does not itself render the entire continuing search process unreasonable. [Citations.]" (At p. 230.) We observe, moreover, that the coat and its contents were under constant police surveillance during the interval and that the delay was not of unreasonable duration. (See *People* v. *Williams, supra,* at p. 230.)

We therefore hold that, in view of the totality of the circumstances here present, the inspection of the gun and the inventory of the contents of the coat at the police station was the continuation of a search lawfully begun at the McJoy residence and that the entire search process was incident to consent given by Mrs. McJoy and was not unreasonable within the meaning of the Fourth Amendment.

### *The Second Search*

Defendant was arrested on March 30, 1972, at the home of his sister, Mrs. Singleton, after he turned himself in. Later that evening, about 11 p.m., Sergeants Lundblad and Fernald and Deputy Sheriff Monk, all dressed in plain clothes, went to Mrs. Singleton's residence to seek her consent to a search of the area occupied by defendant when he was staying in her home. They did not have a search warrant. They took a blank con-

sent to search form for Mrs. Singleton to sign should she give permission to search. Mrs. Singleton orally consented to the search of the area in the living room where defendant had kept his clothes and where he had been sleeping on a fold-away couch. According to one officer Mrs. Singleton said, "Yes, sure, go ahead. . . . Go ahead. In one area by the sofa and under the stairway, he had some stuff stacked in boxes." Mrs. Singleton also signed the consent form.

The officers pulled out the fold-away couch and found a Montgomery Ward receipt with the victim's name on it. Mrs. Singleton's son, Cedrick, who was present, then pointed out two suitcases in the storage area under the stairs. This area was apparently visible from the living room. Lundblad testified that Cedrick started bringing things out into the middle of the living room saying, "This is his." One of the suitcases had a "Utah" sticker on it, and Lundblad knew that the victim had gone to Utah several months previously because his mother had died.

The police officers removed the two suitcases, the Montgomery Ward receipt, and defendant's articles of clothing, which were in plain view in the living room area, from Mrs. Singleton's premises. They did not open the suitcases until after they had obtained a search warrant authorizing them to do so.

Mrs. Singleton testified she was confused by the whole procedure; that when she asked what would happen if she did not sign the form, she was told by the officers that they would get a search warrant, so she signed the form. Lundblad testified that he did not tell Mrs. Singleton that he would get a search warrant if she did not sign the consent form, but that he probably would have gotten one if she had refused to sign.

Here, again, the propriety of the search must be based on Mrs. Singleton's voluntary consent. Defendant contends that the consent to the search was involuntary because it was obtained under inherently coercive circumstances.

■ Whether consent was voluntarily given or was in submission to an express or implied assertion of authority is a question of fact. (*Schneckloth* v. *Bustamonte*, 412 U.S. 218, 221, 223, 227, 248-249 [36 L.Ed.2d 854, 859, 860, 862-863, 875-876, 93 S.Ct. 2041]; *People* v. *Michael*, 45 Cal.2d 751, 753 [290 P.2d 852]; *People* v. *Strawder*, 34 Cal.App.3d 370, 376 [108 Cal.Rptr. 901].) In the instant case although there was conflicting evidence, the lower court apparently believed the officers' testimony in view of its denial of the motion to suppress. ■ Where there is substantial evidence supporting the conclusion that consent to search was given voluntarily, an implied finding to this effect implicit in the order

admitting the evidence obtained pursuant to such consent, is binding on appeal. (*People* v. *Bilderbach,* 62 Cal.2d 757, 762-763 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Ramos,* 25 Cal.App.3d 529, 536 [101 Cal.Rptr. 230]; *People* v. *Tremayne,* 20 Cal.App.3d 1006, 1016 [98 Cal.Rptr. 193].) ▮ Where evidence on the issue of the voluntary nature of the consent conflicts, the finding of the lower court that the consent was voluntary if supported by substantial evidence, must be upheld. (*People* v. *Bilderbach, supra; People* v. *Gravatt,* 22 Cal.App.3d 133, 137 [99 Cal.Rptr. 287]; *People* v. *Stark,* 275 Cal.App.2d 712, 715 [80 Cal.Rptr. 307]; *Taylor* v. *Superior Court,* 275 Cal.App.2d 146, 151 [79 Cal.Rptr. 677].) ▮ The evidence in the present case in support of a finding of voluntary consent meets the test of substantiality.

As a result of such consent there can be no question that the officers were given permission to search the living room area of Mrs. Singleton's apartment, a room of which she also had dominion and control. Defendant's clothes, which were in plain view, were properly seized since they might on inspection and examination disclose evidence relating to the homicide. The receipt was also properly seized since it was located in an area which Mrs. Singleton might expect to clean. Accordingly, defendant would not have a reasonable expectation of privacy as to the area under the couch. Upon discovering the receipt with the victim's name on it it could properly be seized as evidence of the crime. ▮ Insofar as the suitcases are concerned we are not confronted with the question whether Mrs. Singleton could consent to a search of their contents since they were not searched until after a search warrant was obtained. The seizure of the suitcase with the "Utah" sticker was proper since the officer had been informed that the victim had recently been in Utah and therefore might reasonably believe that it belonged to the victim and that it constituted evidence connecting defendant with the commission of the crime.

In any event, the officers were justified in detaining the suitcases since they could reasonably believe that they contained evidence of the crime. ▮ It is well established that when facts are communicated to law enforcement authorities giving rise to a suspicion that containers contain contraband, such containers, although they may not be searched without a warrant, may be detained while an investigation is made and a search warrant is issued. (*United States* v. *Van Leeuwen,* 397 U.S. 249, 252-253 [25 L.Ed.2d 282, 285-286, 90 S.Ct. 1029]; *Corngold* v. *United States,* 367 F.2d 1, 8; *People* v. *Baker,* 12 Cal.App.3d 826, 834-835 [96 Cal. Rptr. 760].) It is equally well settled that officers may seize instruments of crime and evidence of crime under the same circumstances that permit seizure of contraband. (*People* v. *Thayer,* 63 Cal.2d 635, 638 [47 Cal.

Rptr. 780, 408 P.2d 108]; *People* v. *Marceaux*, 3 Cal.App.3d 613, 617 [83 Cal.Rptr. 798]; *Elder* v. *Bd. of Medical Examiners*, 241 Cal.App.2d 246, 264 [50 Cal.Rptr. 304].) Under the circumstances of this case it was reasonable for the officers to seize the suitcases for purposes of detaining them while they obtained a search warrant to search them. There was no real intrusion by the law enforcement officers of defendant's rights since the officers could have simply remained in Mrs. Singleton's home until they obtained the search warrant. Defendant was not deprived of the use of his property since he was in jail.

### Third Search

The suitcases were opened and searched after a search warrant was obtained. The search uncovered numerous items of clothing which were subsequently identified as belonging to the victim. Defendant attacks the validity of the search warrant. He argues that as a matter of law the warrant was issued without probable cause and that the items seized were not covered by the warrant.

The affidavit for the search warrant was made by Sergeant Lundblad. In it he recites his viewing of the body of deceased on March 12 at the scene where it was discovered and the evidence that it had been run over by an automobile; the identification of the victim by taking his fingerprints and comparing them with the official fingerprints records; the finding of the victim's car in Sacramento with human blood on the tires and human flesh on the pavement beneath it; and that the letters on the side of the tires were the same letters impressed on the ground on which the deceased's body was found.

The affidavit further stated that Robert Nash had seen the victim in the company of defendant at 4:30 p.m. on March 11; that Jearlean McJoy, the woman in whose residence defendant resided, informed Lundblad that defendant was not at her residence on the night of March 11 but did arrive about 5 a.m. or 5:30 a.m. on March 12; and that Jearlean McJoy informed Lundblad that two or three days after the body was found defendant saw the deceased's picture in a newspaper and, after seeing the picture, left the residence and never returned.

The affidavit also recites that a newspaper found in the vehicle had defendant's fingerprints on it; that when Jearlean McJoy put defendant's clothing out on the front porch of her home a .32 caliber gun fell out; that bullets taken out of the victim's body were .32 caliber bullets; that John Cockerham, a criminalist, compared a bullet taken from the body

of deceased and the gun and informed Lundblad that in his opinion the bullet was fired from said gun.

The search of and circumstances surrounding the consent given for the search of the Singleton residence are set forth in the affidavit, and the affidavit describes the property seized as a result of said search, including the suitcase with the "Utah" sticker thereon. The affidavit states that Lundblad was informed by Joann Edwards, a close personal friend of deceased, that the deceased had a suitcase with a "Utah" sticker on it and that he had recently gone to the State of Utah for the funeral of his mother; and that Jearlean McJoy informed him that defendant did not own any suitcases and that when he left her residence he did not take any clothes or suitcases with him.

Defendant asserts that the only competent evidence in the affidavit is Lundblad's personal observation of the victim's body, the scene where it was discovered, and the exterior of the victim's car. He asserts that the rest of the allegations in the affidavit represent either fruits of illegal searches and seizures or based upon hearsay which fails as a matter of law to meet minimum standards of competence.

The attack based on the alleged illegal police searches is directed to the information by Lundblad in the searches at the McJoy residence, the Singleton residence and the victim's automobile. We have already demonstrated that the searches made at the McJoy and Singleton residences were not illegal and we shall hereinafter demonstrate that the search of said automobile was not illegal. Accordingly, the information obtained by Lundblad, who participated in all of these searches, insofar as it is reflected in his affidavit, is from his own personal knowledge. Although Lundblad does not use the words "personal knowledge" it is clear that as to matters other than those stated in the affidavit to have been communicated to him by others, he is speaking from his personal knowledge.

With respect to the allegations in the affidavit which are based on Lundblad's conversations with Robert Nash, Jearlean McJoy, Ethel Singleton and Joann Edwards, defendant asserts that the informants' statements constitute hearsay which is not legally sufficient to support the issuance of the search warrant. In order for a search warrant based on hearsay to be considered valid it must satisfy the two-pronged test set out in *Aguilar* v. *Texas,* 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509]. The two requirements are: (1) The statement of the informers must be factual in nature rather than conclusionary, and it must indicate that the informer had personal knowledge of the facts related; and (2) the affidavit must contain some underlying factual information from which

the issuing judge can reasonably conclude that the information supplied by the informer was reliable. (At pp. 114-115 [12 L.Ed.2d at pp. 728-729].)

■ There can be no question that the first prong of the *Aguilar* test is satisfied. Each of the informants were obviously purporting to speak from their own personal knowledge and their statements were factual and not conclusionary. As to the second prong, i.e., whether there is some underlying factual information from which the magistrate could reasonably conclude that the informant was reliable, its resolution requires a careful analysis.

The People assert that since the informants who are not anonymous may be regarded as "citizen informants" whose information is based on personal knowledge does not require that their reliability shall have been previously tested. In *Krauss* v. *Superior Court,* 5 Cal.3d 418, 421 [96 Cal.Rptr. 455, 487 P.2d 1023], we find the following statement: "As a citizen who observed the commission of a crime, she was more than a mere informer. '[T]ests of reliability that must be applied to experienced stool pigeons do not necessarily apply to every private citizen who aids the police.' [Citations.]" In *Krauss* a maid who had prior experience examining marijuana discovered a substance she believed to be marijuana in a motel room. She conveyed this information to the police and it was detailed in an affidavit for a search warrant. The Supreme Court held that this information supported the issuance of a warrant for the search of the motel room.

The principle articulated in *Krauss* has been applied in cases involving information by a citizen who reports a crime committed in his presence (*People* v. *Guidry,* 262 Cal.App.2d 495, 497-498 [68 Cal.Rptr. 794]; *People* v. *Lewis,* 240 Cal.App.2d 546, 549-550 [49 Cal.Rptr. 579]) and by the victim of a crime. (*People* v. *Gardner,* 252 Cal.App.2d 320, 324-325 [60 Cal.Rptr. 321]; *People* v. *Griffin,* 250 Cal.App.2d 545, 550-551 [58 Cal.Rptr. 707].) In the present case, however, none of the informants had observed what they believed to be criminal activity; the events observed by them were as consistent with innocent activity as with criminal activity. (See *Irwin* v. *Superior Court,* 1 Cal.3d 423, 427 [82 Cal.Rptr. 484, 462 P.2d 12].)[3] It seems to us, however, that the rationale employed in the "citizen-informant" cases is equally applicable to a private citizen who

[3]We do not perceive the presence of the gun discovered by Mrs. McJoy in the coat of defendant on her premises to constitute a crime in view of the provisions of section 12026 permitting the possession of a pistol, revolver, or other firearm within his place of residence.

furnishes information which, while not of activity which may be said to be criminal, is imparted in aid of law enforcement. The reports of such citizens are generally motivated by good citizenship as distinguished from the motivation of persons who are themselves criminally involved or disposed. (See *People* v. *Scoma,* 71 Cal.2d 332, 338 fn. 7 [78 Cal.Rptr. 491, 455 P.2d 419].) The class of persons falling in the latter category are subjected to a more stringent test. (See *People* v. *Griffin, supra,* at pp. 550-551; *People* v. *Lewis, supra,* at pp. 549-550.)

 It should be noted, however, that in the case of a "citizen informer" facts should be stated relative to the informant's *identity* which indicate the reliability of the information given by him. (*People* v. *Scoma, supra,* 71 Cal.2d 332, 338, fn. 7.) The status of a person as a "citizen informer" does not eliminate the necessity of establishing that his or her information was reliable. (*Krauss* v. *Superior Court, supra,* 5 Cal.3d 418, 422.)

 Adverting to the instant case we observe that the identity of all of the "citizen informers" is disclosed in the affidavit. As respects the informant Robert Nash, there are no circumstances presented in the affidavit from which the magistrate could conclude that he was reliable other than his status as a citizen informant. As respects the other three citizen informants, there are additional circumstances set out in the affidavits which would establish that their information was reliable. The circumstances of Mrs. McJoy's relationship as defendant's landlady, her exercise of dominion of his clothing, and the circumstances of her discovery of the gun which the affidavit indicates came into the possession of the police, suffice to impress her information with the badge of reliability. Similarly, reliability as to Mrs. Singleton's information is established by the circumstances as narrated in the affidavit with respect to her consent to the search of her apartment and the circumstances of the discovery and seizure of specifically described property, including a suitcase with a sticker with the word "Utah" thereon. The last mentioned circumstance justified a conclusion by the magistrate that Joann Edwards, who stated that the victim had such a suitcase, was reliable.

We note that the affidavit for the search warrant merely sought authorization to search the property taken from Mrs. Singleton's apartment. The affidavit, although containing some deficiencies, sufficed, when interpreted in a commonsense manner, for the issuance of a warrant to conduct such a search. (*People* v. *Superior Court,* 6 Cal.3d 704, 711 [100 Cal.Rptr. 319, 493 P.2d 1183].) The instant affidavit contains sufficient competent information to support the finding of the issuing magistrate.

■ There is no merit to defendant's claim that the items seized were not covered by the warrant. The warrant describes the property he seized as "Property belonging to [the victim] and contains further property including, but not limited to, the following: . . . Any other items showing the same to be the property of said deceased." Accordingly, the articles of clothing in the suitcases belonging to the victim and the suitcases themselves were covered by the warrant.

*Fourth Search*

Sergeant Lundblad testified that the victim had been shot three times and run over by the wheels of an automobile. There were tire imprints on the soft dirt near the victim's head. After the victim was identified a record check revealed that he owned a 1966 blue Pontiac two-door sedan bearing license number RON 945. On March 15 a car bearing this description was found in a parking lot in Sacramento about four-tenths of a mile from the McJoy residence. There was a traffic citation on the car dated March 13 at 9 a.m. for parking in a restricted zone.

Lundblad testified that he saw what appeared to be blood on the left front wheel of the car, and the three letters which were imprinted in the dirt at the site where the body was found were on the tire of the car. There was also a piece of material of a substance that appeared to be flesh near the tire.

The car was caused to be towed by Lundblad to the Sacramento County crime laboratory where a search revealed a Standard Oil credit card receipt, a tie with blood on it, and a newspaper on the floor opposite the front seat. No search warrant had been obtained for the search of the car.

■ Defendant concedes that the police were justified in seizing the automobile but contends that they were required to obtain a search warrant before they could conduct an inventory of the vehicle's contents. Defendant overlooks the fact that the vehicle itself was evidence relevant to the crime. "[W]hen the police lawfully seize a car which is itself *evidence* of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures." (*People* v. *Webb, supra,* 66 Cal.2d 107, 123-124, fn. 3; *People* v. *Teale, supra,* 70 Cal.2d 497, 508.) In *People* v. *Talbot,* 64 Cal.2d 691, 708 [51 Cal.Rptr. 417, 414 P.2d 633], the court upheld a search of a car trunk where a police officer found what appeared to be blood on the right rear fender and trunk area of the car.

In the instant case the police had ascertained that a car had run over

the victim and upon locating the car they were justified in believing that this was the vehicle whose wheels had run over him. A scientific examination of the interior of the vehicle was, therefore, proper.

### Felony-Murder Instruction

The trial judge instructed the jury as to first degree murder based on premeditation or deliberation, and then instructed as follows:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of robbery or burglary, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree. . . .

"Every person who enters any house, room or apartment with the specific intent to steal, take and carry away the personal property of another of any value with the specific intent to deprive the owner permanently of his property is guilty of burglary.

"The essence of a burglary is entering such a place with such specific intent, and the crime of burglary is complete as soon as the entry is made, regardless of whether the intent thereafter is carried out. . . ."[4]

██ Defendant argues that the giving of the instruction constitutes prejudicial error because there was no evidence to support an inference of burglary. We do not perceive such error. The possession by defendant of certain articles of the victim's clothing, when considered with defendant's possession of the keys to the victim's apartment and his statement to his nephew, Cedrick Owens, that the clothing belonged to him, suffice to support the giving of the subject instruction. Although the possession alone of stolen property is not of itself sufficient to sustain the possessor's conviction of burglary, such possession, coupled with corroborating evidence of acts, conduct or declarations of the accused tending to show his guilt, will sustain a conviction of burglary. (*People* v. *Citrino,* 46 Cal.2d 284, 288 [294 P.2d 32]; *People* v. *Carroll,* 79 Cal.App.2d 146, 148 [179 P.2d 75].) When possession is shown the corroborating evidence may be slight. (*People* v. *Citrino, supra; People* v. *Thompson,* 120 Cal.App.2d 359, 363 [260 P.2d 1019].)

---

[4]The court also instructed the jury on the definition of robbery that the specific intent to commit robbery or burglary or the attempt to commit such crime, must be proved beyond a reasonable doubt and delineated certain evidence that the jury might consider in determining whether there is a reasonable doubt that the shooting was perpetrated during a robbery or burglary, or the attempt to commit these crimes. Instructions were also given on murder of the second degree.

In the instant case the jury was instructed as to murder of the first degree perpetrated by deliberate and premeditated killing and murder of the first degree resulting from the commission of a robbery or burglary. The jury was also instructed as to second degree murder. The jury was not required to find that any of these degrees of murder were committed, and the jury was particularly instructed that it was to disregard any instructions which applied to a state of facts which did not exist.[5] Under the evidence adduced the jury could find that defendant was not guilty of first degree murder perpetrated during a burglary but that he was guilty of first degree murder based on premeditation and deliberation or first degree murder resulting from the perpetration of a robbery.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 8, 1974.

---

[5]The trial judge gave the following cautionary instruction: "You have been instructed as to all the rules of law that may be necessary for you to reach a verdict, Whether some of the instructions will apply will depend upon your determination of the facts. You will disregard any instruction which applies to a state of facts which you determine does not exist. You must not conclude from the fact that an instruction has been given that the Court is expressing any opinion as to the facts."